# United States Court of Appeals for the Federal Circuit

---

**SKF USA INC., SKF FRANCE S.A., SKF AEROSPACE FRANCE S.A.S., SKF GMBH, AND SKF INDUSTRIE S.P.A.**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

AND

**TIMKEN U.S. CORPORATION,**
*Defendant-Appellee.*

---

2010-1128

---

Appeal from the United States Court of International Trade in case no. 07-CV-0393, Judge Timothy C. Stanceu.

---

Decided: January 7, 2011

---

HERBERT C. SHELLEY, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were ALICE A. KIPEL and LAURA R. ARDITO.

CLAUDIA BURKE, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel on the brief was JONATHAN ZIELINSKI, Office of the Chief Counsel, United States Department of Commerce, of Washington, DC.

GEERT DE PREST, Stewart and Stewart, of Washington, DC, argued for defendant-appellee Timken U.S. Corporation. With her on the brief were TERENCE P. STEWART and LANE S. HUREWITZ.

NEIL R. ELLIS, Sidley Austin LLP, of Washington, DC, for amici curiae JTEKT Corporation and Koyo Corporation of U.S.A. With him on the brief were ERIC A. SHUMSKY and JILL CAIAZZO.

MATTHEW P. JAFFE, Crowell & Moring LLP, of Washington, DC, for amici curiae NSK Ltd. and NSK Corporation. With him on the brief were ROBERT A. LIPSTEIN and ALEXANDER H. SCHAEFER.

_____

Before GAJARSA, LINN, and DYK, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* DYK.

Opinion Concurring in Part and Dissenting in Part filed by *Circuit Judge* LINN.

DYK, *Circuit Judge*.

Plaintiffs SKF USA Inc., SKF France S.A., SKF Aerospace France S.A.S., SKF GMBH, and SKF Industrie S.p.A. (collectively "SKF" or "plaintiffs") appeal a decision

of the Court of International Trade ("Trade Court"). That decision affirmed the final determination of the United States Department of Commerce ("Commerce") in its seventeenth administrative review of antidumping duty orders on ball bearings and parts thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom. We conclude that Commerce had the statutory authority to use an unaffiliated supplier's actual costs of production in calculating constructed value ("CV"), but we hold that Commerce failed to adequately explain its decision to change its methodology for calculating SKF's CV. We also hold that Commerce had the statutory authority to utilize zeroing. Accordingly, we affirm in part and vacate and remand in part.

## BACKGROUND

SKF GmbH, an SKF company located in Germany, produces and sells ball bearings and also purchases some finished bearings from an unaffiliated German competitor to complement its product line. SKF exports some of these products to the United States. SKF, along with other bearing exporters, is subject to an antidumping duty order issued by Commerce with respect to sales of ball bearings from Germany, among other countries. The original antidumping order was entered in 1989. Thereafter, Commerce has conducted administrative reviews. "Recognizing that prices and costs change over the course of time, Congress provided that Commerce shall conduct an annual administrative review 'if a request for such a review [is] received.'" *Dofasco Inc. v. United States*, 390 F.3d 1370, 1372 (Fed. Cir. 2004). During an administrative review, Commerce determines a new dumping margin. *See* 19 U.S.C. § 1675(a)(2)(A).

Dumping occurs when the price at which imported merchandise is sold in the United States is less than the

merchandise's "normal value"—i.e. fair value in the home market. *See* 19 U.S.C. §§1673, 1677b(a). When Commerce cannot determine "normal value" based on actual sales of the subject merchandise in its home market, the statute provides for calculation of CV as a proxy for the sale price in the home market. *Id.* § 1677b(a)(4). One component used in calculating CV is "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise." *Id.* § 1677b(e)(1).

During its original investigation and the next sixteen administrative reviews of ball bearing antidumping orders, Commerce used SKF's acquisition costs in calculating the CV of subject ball bearings SKF sold in the United States but obtained from its unaffiliated supplier. During the fifteenth administrative review, the petitioner, Timken US Corporation ("Timken"), apprised Commerce that some respondents had acquired finished bearings from unaffiliated suppliers and resold them in the United States. Commerce noted that "[g]iven the statutory emphasis on the use of actual costs of production in calculating COP and CV, it may be appropriate" to require actual cost data. J.A. 2003. However, Commerce deferred implementation of this change, reasoning that the review was at too late a stage to require acquisition of cost data from unaffiliated suppliers. *Id.* at 2004–05. In the future, Commerce suggested that it might "require the respondents to report COP and CV information for purchases from their unaffiliated suppliers where facts . . . reflect the facts in other proceedings . . . in which we have required the COP and CV information from unaffiliated suppliers." *Id.* at 2005.

During the seventeenth review, Commerce for the first time required respondents to produce actual COP and CV data from their unaffiliated suppliers when a "substantial proportion" of the respondent's sales were

"sales of merchandise produced by unaffiliated suppliers." J.A. 5002–03. SKF and four other respondents fell into this category.[1] SKF's unaffiliated supplier was also an exporter and, therefore, a competitor that was also subject to the antidumping order. When SKF was unable to obtain the data, Commerce acquired the data directly from the unaffiliated supplier. Commerce did not require other respondents to report actual cost data because "the relative insignificance of sales of merchandise purchased from unaffiliated suppliers" meant it was unlikely that using the suppliers' actual data "will have a significant impact on [the] margin calculations." J.A. 5002.

Commerce proposed to use these cost data in calculating CV. SKF and other respondents objected to Commerce's proposed use of this actual cost data in calculating CV. Presumably, SKF objected because it worried that using the unaffiliated supplier's actual cost data would yield a higher COP and CV than its acquisition costs, leading to a higher dumping margin. SKF argued, inter alia, that: 1) the statute did not permit Commerce to use the actual cost data from unaffiliated suppliers; 2) Commerce did not adequately explain its change in methodology; and 3) use of unaffiliated supplier data violated due process because SKF could not compel its supplier to cooperate and because SKF could not have access to the data for use in the proceedings. Also, SKF could not "knowingly price" in the United States to avoid

---

[1] Commerce explained SKF's percentage of unaffiliated supplier sales constituted a "substantial proportion" because it was between 25 and 50 percent of home market sales. According to SKF, the facts as to the percentage of subject merchandise obtained from its unaffiliated supplier were the same in the fourteenth, fifteenth, and sixteenth reviews as they were when Commerce changed the methodology in the seventeenth review.

dumping because it would not know its supplier's actual costs.

Commerce issued its final determination using the unaffiliated supplier's actual production costs to calculate CV. In the Issues and Decision Memorandum, Commerce responded to some of SKF's arguments. It explained that the statutory scheme provided for calculating COP and CV "on the basis of actual production costs." *Issues and Decision Memorandum for the Antidumping Duty Administrative Reviews of Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom for the Period of Review May 1, 2005, through April 30, 2006*, at 47 (October 1, 2007) ("Decision Mem."), *available at* http://ia.ita.doc.gov/frn/summary/multiple/e7-20151-1.pdf. It also warned that "[i]f acquisition costs do not capture all of the actual costs of the manufacturer supplying the bearings to the reseller, they are not an appropriate basis for the calculation of CV and . . . the use of such acquisition costs would distort the reseller's dumping margin due to the missing elements of cost." *Id.* at 48. Moreover, it claimed Commerce "has had a long-standing practice of using the actual production costs of unaffiliated suppliers in lieu of the exporter's acquisition costs to calculate COP and CV" and is "moving towards consistency throughout its cases." *Id.* at 48–49 (citing *Honey from Argentina*, 66 Fed. Reg. 50611 (Dep't of Commerce Oct. 4, 2001) (final determination); *Elemental Sulphur from Canada*, 61 Fed. Reg. 8239, 8251 (Dep't of Commerce Mar. 4, 1996) (final administrative review); *Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7661, 7665 (Dep't of Commerce Feb. 25, 1991) (final determination)).

Responding to SKF's contention that it could not access the unaffiliated supplier data, Commerce explained that SKF's counsel could have access to the data under an

Administrative Protective Order ("APO"). Commerce did not, however, respond to SKF's concern that it could not "knowingly price" its products to avoid dumping. Nor did it address SKF's concern that it could not compel its unaffiliated supplier to provide the data. In fact, Commerce stated that it might apply an adverse inference if the producer did not provide the data (though in this instance the supplier had provided the data). *Decision Mem.* at 48.

In the final decision, Commerce also continued to utilize zeroing to calculate dumping margins. Zeroing refers to a practice under which, when the export price is higher than the normal value of the subject merchandise, Commerce assigns it a value of zero rather than a negative value in calculating the average dumping margin. *See SKF USA Inc. v. United States*, 659 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 2009).

SKF sought review in the Trade Court, and that court affirmed.[2] The Trade Court agreed that the statute allowed Commerce to use unaffiliated supplier cost information. The Trade Court also found Commerce provided a reasonable explanation for methodology change. It dismissed SKF's due process concerns because SKF's counsel could review the unaffiliated supplier's data. It did not, however, address SKF's concerns about adverse inferences and its inability to price its products to avoid

---

[2] Below, SKF also challenged Commerce's decision to issue duty assessment and liquidation instructions to United States Customs and Border Protection fifteen days after publication of the final results of the administrative reviews, arguing that Commerce was required to wait at least thirty days to issue the instructions. *Id.* at 1339–40. The Trade Court held that the policy was not in accordance with law. *Id.* at 1352. This part of the Trade Court's decision is not at issue on appeal.

dumping. Finally, the Trade Court held that zeroing methodology was not impermissible. SKF timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

I

We review Trade Court antidumping decisions de novo, applying the same standard of review as the Trade Court applies to Commerce's determinations. *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1346 (Fed. Cir. 2005). Commerce's determination must be sustained if it is supported by substantial evidence and otherwise in accordance with law. *Id.* (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

Commerce argues that, in conjunction, 19 U.S.C. §§ 1677b(e), 1677b(f)(1)(A), and 1677(28) permit using unaffiliated suppliers' actual cost data to calculate CV. Under § 1677b(e), CV is calculated by the sum of:

> (1) *the cost of materials and fabrication or other processing of any kind employed in producing the merchandise*, during a period which would ordinarily permit the production of the merchandise in the ordinary course of business; [and] (2)(A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product . . . .

§ 1677b(e) (emphasis added). Then, § 1677b(f)(1)(A) further explains that "[c]osts shall normally be calculated based on the records of *the exporter or producer of the merchandise*, if such records are kept in accordance with

the generally accepted accounting principles of the export-ing country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." § 1677b(f)(1)(A) (emphasis added). Finally, § 1677(28) defines the term "exporter or producer" as

> the exporter of the subject merchandise, the pro-ducer of the subject merchandise, or *both where appropriate.* For purposes of section 1677b of this title, the term "exporter or producer" includes *both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the to-tal amount incurred and realized for costs*, ex-penses, and profits in connection with production and sale of that merchandise.

§ 1677(28) (emphases added). CV requires calculation of the "cost of materials and fabrication or other processing of any kind employed in producing the merchandise," § 1677b(e)(1), which should be based on the "records of the exporter or producer" of the merchandise, § 1677b(f)(1)(A), which, in turn, includes "both the exporter of the subject merchandise and the producer," § 1677(28).

On the face of these provisions, Commerce can utilize unaffiliated suppliers' records for cost of production data in lieu of the exporter's acquisition cost. The statute explicitly provides that costs should be "based on the records of the exporter or producer of the merchandise," § 1677b(f)(1)(A), and defines exporter or producer as "both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs," § 1677(28). Additionally, legislative history—the Statement of Administrative Action accom-panying the Uruguay Round Agreements Act—explained

that the purpose of § 1677(28) was "to clarify that where different firms perform the production and selling functions, Commerce may include the costs . . . of each firm in calculating [COP] and [CV]." *See* H.R. Rep. No. 103–826, pt. 1, at 77 (1994) (incorporating Statement of Administrative Action into committee report). Notably, for selling, general, and administrative expenses and profits (other components of CV), the statute explicitly limits the source of data to "the specific exporter or producer being examined in the investigation or review." 19 U.S.C. § 1677b(e)(2)(A). This suggests that cost of production data is not so limited. Therefore, although the statute does not mandate that Commerce must use actual cost data, it unambiguously allows Commerce to prefer the actual production costs of unaffiliated suppliers of finished subject merchandise over acquisition costs.

However, SKF argues that other provisions of the statute, 19 U.S.C. § 1677b(f)(2) and (3), indicate "that sales by unaffiliated suppliers adequately represent the required cost of production data." Appellant's Br. 16. Subsection 1677b(f)(2) provides that the transaction price (i.e., acquisition cost) "between affiliated persons *may* be disregarded if" that price "does not fairly reflect the amount usually reflected in sales of merchandise under consideration." § 1677b(f)(2) (emphasis added). In that case, if "no other transactions are available for consideration," Commerce calculates the amount based on "what the amount would have been if the transaction had occurred between [unaffiliated parties]." *Id.* SKF contends that, therefore, transactions with unaffiliated parties are sufficiently arm's length to "reasonably reflect the costs associated with the production and sale of [subject] merchandise" under § 1677b(f)(1)(A).

Similarly, subsection 1677b(f)(3)—termed the "major input rule"—provides that "[i]f, in the case of a transac-

tion between affiliated persons involving the production by one of such persons of a major input to the merchandise, [Commerce] has reasonable grounds to believe or suspect the amount represented as the value of such input is less than the cost of production," then Commerce may utilize actual cost of the input.  But it does so only if that cost is greater than the price if the transaction had occurred between unaffiliated parties.  *Id.*; *see also* 19 C.F.R. § 351.407(b).  Again, SKF argues, this provision demonstrates that transaction prices between unaffiliated parties are generally sufficient proxies for cost.

We cannot agree that sections 1677b(f)(2) and (3) bar Commerce from using unaffiliated supplier cost data. Those sections on their face relate only to affiliated party transactions. They do not require that Commerce always use the transaction price between unaffiliated parties as the measure for production costs.  They merely allow Commerce to use the unaffiliated party transaction price as a proxy for cost in a specific set of circumstances where a transaction between affiliated entities does not appear to adequately represent the true amount.

SKF also argues that Commerce's approach violates due process because  SKF cannot review its unaffiliated supplier's cost data and cannot compel an unaffiliated company to provide such data.  Therefore, it risks "a determination of adverse facts available as a consequence of an unaffiliated competitor's failure to comply with a request" for cost data.  Appellant's Br. 28.  While, as discussed below, SKF's concerns raise questions as to the adequacy of Commerce's explanation for its change in approach, they do not constitute a due process violation. A due process objection can be raised only in the particular case where there has been a violation.  *See Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 284 n.49 (1969) (declining to address plaintiff's claim that it would be due

process violation to evict her arbitrarily because, under the facts on review, she had not yet been evicted). Here, SKF's counsel had access to and a chance to review the data under APO procedures, and the supplier provided the data; Commerce did not utilize adverse facts available. Although counsel's access to the data without an ability to consult with the respondent creates a disadvantage, it is not so substantial as to raise any constitutional concerns. Thus, there was no due process violation.

## II

SKF also asserts that Commerce did not provide a reasonable explanation for its change in methodology after sixteen administrative reviews. During the prior reviews, SKF and other respondents submitted their acquisition cost for finished bearings purchased from unaffiliated suppliers as representative of its costs for that merchandise. Commerce apparently approved of this practice. In its 1988 Request for Information to the respondents, Commerce explained that the "[c]ost of materials should include the *purchase price*, transportation charges, duties and all other expenses normally associated with the material costs." J.A. 256 (emphasis added). For *related* suppliers, Commerce required "the actual costs of the bearings [to be] obtained from [the] suppliers," but it made no similar comment with respect to unrelated suppliers. *Id.*

When an agency changes its practice, it is obligated to provide an adequate explanation for the change. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). In *State Farm*, the Court found the Department of Transportation did not adequately explain its decision to rescind a regulation that vehicles be equipped with passive restraints (airbags or automatic seatbelts), in large part because the agency

too quickly dismissed other alternatives and the safety benefits of retaining the existing rule. *Id.* at 46–56.[3] We have held that the *State Farm* requirement applies to Commerce's antidumping proceedings. *See SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). In *SKF USA*, we stated that the antidumping statute is "highly complex" and "[t]he more complex the statute, the greater the obligation on the agency to explain its position with clarity." *Id.* at 1382–83.

We think that Commerce has adequately explained why a change would serve legitimate objectives. Commerce concluded using unaffiliated supplier data to calculate CV would allow it to "capture all of the actual costs of the manufacturer," while using acquisition costs would "distort the reseller's dumping margin due to the missing elements of cost." *Decision Mem.* at 48. Commerce also noted its "longstanding practice of using the actual production costs of unaffiliated suppliers in lieu of the exporter's acquisition costs to calculate COP and CV" and its "mov[e] towards consistency." *Id.* at 48–49. Indeed, Commerce cited numerous cases where it required unaffiliated supplier data, including *Individual Quick Frozen Red Raspberries from Chile*, 69 Fed. Reg. 47869, 47872 (Dep't of Commerce Aug. 6, 2004) (preliminary administrative review results), in which it explained that "[w]here the sale to an exporter or reseller is finished subject merchandise, the Department's practice is to rely on the

---

[3] Under *State Farm*, factors to consider when determining whether agency action is arbitrary and capricious are: "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43.

COP of the producer."[4]  We agree with Commerce that consistency is an important interest and that it was understandable for it to change methodologies in an attempt to align this case with its past practice.[5]

Nevertheless, Commerce still failed to comply with its *State Farm* obligation to provide an adequate explanation. Commerce did not sufficiently explain why two of SKF's concerns about the use of unaffiliated suppliers' actual cost data were not implicated or why they were outweighed by competing considerations.  Under *State Farm*, an agency explanation may be unreasonable if the agency "entirely failed to consider an important aspect of the

---

[4]    SKF cites only one case in which Commerce specifically declined to use unaffiliated supplier data.  *Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 Fed. Reg. 29310, 29311 (Dep't of Commerce May 22, 2006) (final determination) (adopting *Issues and Decisions Memorandum for the Final Determination*, 71 ITADOC 29310, at cmt. 56 (May 22, 2006)).  In that case, Commerce declined to require actual cost data because the quantity of products resold by the exporter was "negligible," *id.*, which is perfectly consistent with Commerce's decision here in the seventeenth review to require such data only when a "substantial proportion" of sales were of finished merchandise acquired from an unaffiliated supplier.

[5]    We note that Commerce uses producer cost data for finished products, but when an unaffiliated supplier provides only an input, and not finished merchandise, Commerce apparently uses acquisition cost.  The Trade Court has held that "[p]rices [a respondent] pays for materials are part of its costs.  Thus, what it pays for inputs [i.e. the acquisition cost] must be used to calculate constructed value, unless the sale of the input is by a related party," which would be governed by the major input rule at § 1677b(f)(3).  *Consolidated Int'l Auto., Inc. v. United States*, 809 F. Supp. 125, 128 (Ct. Int'l Trade 1992).  There is no occasion here to consider the propriety of using producer cost data in the context of major inputs.

problem." 463 U.S. at 43. Accordingly, Commerce also has an "obligation" to address important factors raised by comments from petitioners and respondents. *See Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1358 (Fed. Cir. 2005); *see also Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (stating that an "agency is . . . required to respond to comments that are relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule [because they] cast doubt on the reasonableness of a position taken by the agency" (internal quotation marks omitted)). In *Timken,* we rejected the International Trade Commission's argument that "its obligation is limited to addressing statutorily enumerated factors" and that it was not compelled to consider adverse effects of its decision, calling the position "untenable" and "not consistent with *State Farm*." *Id.* at 1358.

In this case, Commerce did not address two significant concerns raised by SKF. The first of these was that it could not change its pricing to avoid dumping because it would have no knowledge of its unaffiliated supplier's actual production costs. Essentially, SKF "will never be able to adjust its sales or pricing, or even its acquisition policies, in an effort to increase its compliance with the U.S. antidumping law and decrease its dumping liability." Appellant's Br. 29. Even the petitioner, Timken, admitted at oral argument that it is difficult for an exporter to know whether it is dumping or to change its pricing practice to avoid dumping when it does not know or control its unaffiliated supplier's costs. The ability to control pricing to avoid dumping is also important because, under 19 C.F.R. § 351.222(b), (d), (e)(1), and (f), exporters and producers who avoid dumping for three consecutive years become eligible to have their antidumping orders revoked. If SKF cannot adjust its pricing to

avoid dumping, it becomes more difficult to gain eligibility for revocation.  As amici (other respondents under the ball bearing antidumping order) point out, such a result would undermine the remedial purpose of the antidumping laws. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("[T]he antidumping laws are remedial not punitive.").  Commerce did not address SKF's concern that it could not control its pricing to avoid dumping in its Issues and Decision Memorandum or explain why this concern was unjustified or why it was outweighed by other considerations.

Similarly, Commerce did not address SKF's concern that Commerce would apply an adverse inference if the unaffiliated supplier failed to provide cost data.  While no such adverse inference was drawn here, this concern must be considered in assessing the overall reasonableness of Commerce's approach. SKF's concern was not misplaced. Commerce stated in its Issues and Decision Memorandum that "in those instances where the producer did not provide the requested cost data, the Department has found it appropriate to make an adverse inference."  *Decision Mem.* at 48.  In fact, SKF's fears proved well founded when, during the eighteenth review, Commerce applied "facts otherwise available and an adverse inference" when SKF's supplier did not timely submit its data.  *See SKF USA, Inc. v. United States*, 675 F. Supp. 2d 1264, 1268 (Ct. Int'l Trade 2009).  Even though the Trade Court overturned the application of an adverse inference,[6]

---

[6]    The Trade Court found Commerce acted contrary to law by drawing an adverse inference because "[a]llowing an interested party's failure to cooperate to affect adversely the dumping margin of another interested party who is a party to the proceeding, about whom Commerce did not make a finding of non-cooperation, violates the Department's obligation to treat fairly every participant in an administrative proceeding." *Id.* at 1276.

Commerce has not stated that it will abandon the practice of using adverse inferences. Use of adverse inferences may be unfair considering SKF has no control over its unaffiliated supplier's actions. Again, Commerce must explain why SKF's concern is unwarranted or is outweighed by other considerations.

In failing to consider these two problems, we find that Commerce failed to adequately explain its change of methodology after sixteen reviews. *See Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1217 (D.C. Cir. 2004) (holding that the failure to consider an important aspect of the problem was alone "dispositive" and required reversal under *State Farm*).

## III

Finally, SKF argues that Commerce improperly used zeroing in calculating its weighted-average dumping margin because it is prohibited by the World Trade Organization ("WTO"). Commerce changed its practice for original investigations and no longer uses zeroing for calculation of weighted average dumping margins, but it continues to use zeroing during administrative reviews. *See Antidumping Proceedings: Calculation of the Weighted Average Dumping Margin During an Antidumping Duty Investigation; Final Modification*, 71 Fed. Reg. 77722, 77724 (Dec. 27, 2006). In *Timken Co. v. United States*, 354 F.3d 1334, 1341–45 (Fed. Cir. 2004), the court held that its governing statute did not forbid the use of zeroing. In *U.S. Steel Corp. v. United States*, 621 F.3d 1351 (Fed. Cir. 2010), we upheld Commerce's application of its new policy not to use zeroing in original investiga-

---

On remand, Commerce relied on SKF's acquisition cost (as it had during the first sixteen reviews) because it could not acquire the actual cost data or draw an adverse inference. J.A. 15501.

tions. Even after Commerce changed its policy with respect to original investigations, we have held that Commerce's application of zeroing to administrative reviews is not inconsistent with the statute. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1375 (Fed. Cir. 2007). Moreover, we have held that WTO decisions do not change United States law unless implemented pursuant to an express statutory scheme. *See, e.g.*, *NSK Ltd. v. United States*, 510 F.3d 1375, 1379–80 (Fed. Cir. 2007); *Corus Staal BV*, 395 F.3d at 1349. The WTO decisions cited by SKF have not been so implemented.

## IV

For the foregoing reasons, we affirm the Trade Court's decision that Commerce has the authority to use unaffiliated suppliers' actual costs of production in calculating CV and to utilize zeroing. However, we conclude that Commerce in two respects did not provide a reasonable explanation for its decision to depart from its prior methodology in this particular case. Accordingly, we affirm-in-part and vacate-in-part and remand.

**AFFIRMED-IN-PART AND VACATED-IN-PART AND REMANDED**

COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**SKF USA INC., SKF FRANCE S.A., SKF AEROSPACE FRANCE S.A.S., SKF GMBH, AND SKF INDUSTRIE S.P.A.**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

AND

**TIMKEN U.S. CORPORATION,**
*Defendant-Appellee.*

---

2010-1128

---

Appeal from the United States Court of International Trade in case no. 07-CV-0393, Judge Timothy C. Stanceu.

---

LINN, *Circuit Judge*, concurring in part and dissenting in part.

I am pleased to join the majority's holding that Commerce has the authority to use unaffiliated suppliers' actual costs of production in calculating CV and to utilize zeroing. I respectfully dissent only from the portion of the opinion concluding that Commerce failed to comply with its obligation under *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual*

*Automobile Insurance Co.* (*State Farm*), 463 U.S. 29, 42 (1983) and remanding to Commerce for further explanation.

The majority held that Commerce failed to satisfy its *State Farm* obligation by insufficiently explaining why two of SKF's concerns about the use of unaffiliated suppliers' actual cost data were not implicated or why they were outweighed by competing considerations. Maj. Op. at 14-17. Under *State Farm*, an agency explanation may be unreasonable if the agency "entirely failed to consider an *important aspect* of the problem." 463 U.S. at 42 (emphasis added). "[T]he fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information. Rather, the Commission need only discuss material issues of law or fact." *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355-56 (Fed. Cir. 2005) (internal citations and quotations omitted). This court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (internal citations and quotations omitted).

The majority vacates the Trade Court's decision and remands for Commerce to provide additional responses to two of SKF's asserted concerns. In my view, neither of SKF's concerns amount to an important aspect of the problem or a material issue of law or fact.

SKF's first concern is that it could not change its pricing to avoid dumping because it would have no knowledge of its unaffiliated suppliers' actual production costs. SKF, however, offers no explanation why it could not simply require the actual cost of production data from an unaffiliated supplier as a condition for purchase. Further, Commerce did not entirely fail to consider this argument. Commerce considered this concern in its response to

SKF's assertion that it faced a catch-22 of either sharing confidential information with a competitor, risking an antitrust violation, or "attempt[ing] to price [its] products without any apparent reference point for normal value." Decision Mem. at 48. Commerce thus considered, but "disagree[d] with[,] SKF's assertion." *Id.*

SKF's second concern relates to the potential for Commerce to draw adverse inferences if the unaffiliated supplier fails to provide cost data. In this case, Commerce did not draw such adverse inferences. Although "Commerce has not stated that it will abandon the practice of using adverse inferences," Maj. Op. at 17, when Commerce attempted to do so during the eighteenth review, the Trade Court overturned the drawing of adverse inferences as "contrary to law." Maj. Op. at 16-17 n.6. SKF's concern is no longer relevant to this investigation, and any further explanation by Commerce would be advisory at best. Moreover, Commerce did not entirely fail to consider this argument either. Commerce briefly addressed its practice of adverse inferences and simply determined that it would not apply it in this case. *See* Decision Mem. at 48-49.

In light of the foregoing, it is my view that neither of SKF's concerns raises an important aspect of the problem or a material issue warranting a vacatur and remand. Commerce has adequately explained its change in practice, adequately considered SKF's concerns, and Commerce's path may reasonably be discerned from its decision. Commerce explained that its decision was based upon the statutory emphasis on the use of actual costs, the Statement of Administrative Action's language contemplating the same, the inability of acquisition costs to properly capture the actual costs of the manufacturer in this situation, and the need for more consistency. Decision Mem. at 47-49. Not only did Commerce provide a

reasoned explanation for its change in practice after sixteen years, but Commerce warned SKF during the fifteenth administrative review that it would be changing to this methodology and did not implement the change until two review years later, during the seventeenth administrative review. Even if Commerce's explanation of the two concerns raised by SKF and found wanting by the majority lacked ideal clarity, a point with which I disagree, this court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43.

Because Commerce sufficiently addressed all material concerns and its path can be reasonably discerned, I see no need to remand for further explanation and would affirm.